W. *v.* W.*
(SC 15956)

Borden, Berdon, Norcott, Katz and Palmer, Js.

---

* Following oral argument in this court, we have ordered, sua sponte, the file to be sealed and have changed the name of the case to protect the privacy of the parties.

488

Argued January 19—officially released April 27, 1999

*James H. Lee,* for the appellant (defendant).

*Stephen T. Kulig,* for the appellee (plaintiff).

*Opinion*

KATZ, J. This appeal involves a pendente lite child support dispute concerning a minor child, who was

born to the plaintiff prior to her marriage to the defendant. Although the defendant is not the child's biological father, the trial court estopped him from denying paternity and issued temporary child support orders against him. The issues to be decided in this appeal are whether: (1) the trial court, pursuant to General Statutes § 46b-56,[1] had jurisdiction to order temporary child support for a child when the defendant in the dissolution action is not the biological father of the child; (2) the trial court acted improperly when it equitably estopped the defendant from denying paternity of the child; and (3) the trial court, pursuant to General Statutes § 46b-84,[2] acted improperly in failing to modify an earlier temporary child support order despite its finding of no substantial change in the defendant's financial circumstances. We affirm the judgment of the trial court.

The trial court set forth the following relevant facts and underlying procedural history. Soon after the plaintiff and the defendant had begun to have sexual relations, the plaintiff informed the defendant that she

[1] General Statutes § 46b-56 (a) provides: "In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint [seeking the dissolution of a marriage], the court may at any time make or modify any proper order regarding the education and support of the children and of care, custody and visitation if it has jurisdiction under the provisions of chapter 815o [the Uniform Child Custody Jurisdiction Act]. Subject to the provisions of section 46b-56a, the court may assign the custody of any child to the parents jointly, to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. The court may also make any order granting the right of visitation of any child to a third party, including but not limited to, grandparents."

General Statutes § 46b-83, which also permits support pendente lite, provides in relevant part: "At any time after the return day of a complaint [seeking the dissolution of a marriage], and after hearing . . . support pendente lite may be awarded to either of the parties from the date of the filing of an application therefor with the Superior Court. . . ."

[2] General Statutes § 46b-84 (a) provides in relevant part: "Upon or subsequent to the . . . dissolution of any marriage . . . the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance."

might be pregnant. After the pregnancy was confirmed, but before the birth of the child, both parties recognized that the defendant might not be the child's biological father. Following the child's birth on June 15, 1986, the parties agreed that the child should bear the defendant's last name.

Soon thereafter, the plaintiff moved to Rhode Island to live with the defendant. Following her arrival, the plaintiff applied for public assistance, naming her former boyfriend, D, as the father of the child. Before the plaintiff could complete the documents necessary to institute paternity proceedings, however, the defendant destroyed the documents. The trial court found that the defendant had persuaded the plaintiff not to seek blood tests to determine paternity, and, consequently, to forgo public assistance and child support from D. The trial court found further that the defendant had taken such actions because he did not want D to play any role in the life of the child.

The parties continued to live together for approximately the next three years. On March 11, 1989, they married after the plaintiff had become pregnant with the defendant's child. Their child, whose paternity the defendant does not challenge, was born on July 28, 1989.

On January 21, 1997, the plaintiff commenced the dissolution action underlying the present appeal. The trial court, by agreement of the parties, issued a temporary child support order, which obligated the defendant to pay the plaintiff a total of $175 per week for both children. According to the defendant's financial affidavit, in March, 1997, the defendant was earning $724 per week in gross income, with a net income of $493 per week.

One month later the defendant moved to modify the child support order. On May 5, 1997, the trial court

granted a downward modification, ordering the defendant to pay $150 per week for both children. At that time, the defendant's affidavit reflected a gross income of $507 per week, with a net income of $349 per week.

Subsequently, the plaintiff moved for an upward modification of the child support order. On September 29, 1997, the court granted the motion, increased the order to $201 per week and $40 per week against the $800 arrearage.[3] The defendant's financial affidavit indicated a net income of $403 per week at that time.

On November 17, 1997, the defendant moved for a blood test to establish the paternity of the older child, and for a downward modification of the child support order based on an alleged substantial decrease in his income. Prior to filing this motion the plaintiff had, on occasion, suggested paternity testing to establish conclusively the paternity of the older child, but the defendant had consistently refused to submit to such testing because, according to the trial court, he feared it would reveal that he was not the father of the child. Until the time of the motion for the blood test, the defendant consistently had treated the older child as his own daughter, despite her uncertain parentage. On November 17, 1997, the trial court granted the defendant's motion for paternity testing. The test results excluded the defendant as the father of the child.[4]

Despite the paternity test results, the trial court, relying on the doctrine of equitable estoppel, barred the defendant from disclaiming that he is the father of the

---

[3] The arrearage had accumulated because the defendant had failed to pay his prior temporary child support obligations as ordered by the trial court.

[4] Because, for the reasons that follow hereinafter, we are affirming the trial court decision estopping the defendant from denying paternity, the results of the blood test are irrelevant to the dissolution action and the related proceedings. *Freedman* v. *McCandless*, 539 Pa. 584, 591, 654 A.2d 529 (1995) (blood test irrelevant where estoppel applied).

older child. The court found that the defendant had acted consistently as the father of the older child, providing emotional and financial support throughout her entire life. The court found further that the parties had raised the child to believe that the defendant is her father, and that indeed, they had never told the child otherwise. Consequently, according to the court, discovering that the defendant is not her biological father as a consequence of this action would have an extremely deleterious emotional effect on her.

Additionally, on a financial level, the court found that the defendant had frustrated the plaintiff's earlier attempts to discern medically who was the child's biological father as well as her efforts to collect public assistance from Rhode Island, and child support from the child's natural father. The court found that, as a result, the plaintiff had failed to collect child support from D for nearly twelve years. According to the court's findings, at the time of the hearing, the whereabouts and wherewithal of D were unknown. Therefore, the plaintiff's current ability to obtain child support from D is uncertain.

Finally, the trial court concluded that the defendant had failed to demonstrate, by a preponderance of the evidence, that his financial circumstances had changed substantially since the issuance of the most recent child support order of September 29, 1997. The trial court, therefore, denied the defendant's motion for modification. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

On appeal, the defendant argues that the trial court: (1) did not have jurisdiction, pursuant to § 46b-56,[5] to order temporary child support for the child in question;

---

[5] See footnote 1 of this opinion for the text of § 46b-56.

(2) improperly estopped the defendant from denying paternity of the child; and (3) acted improperly when it refused to modify the child support order pursuant to § 46b-84.[6] We disagree.

## I

As a general matter of jurisprudence, we resolve issues concerning a court's subject matter jurisdiction before turning to the merits of the parties' claims. See, e.g., *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 289, 695 A.2d 1051 (1997). In the present case, the defendant claims that the child is not a "child of the marriage" because he is not the child's biological father. On that basis, the defendant contends that the trial court lacked subject matter jurisdiction to order temporary child support. We disagree.

Although it is well settled that trial courts have broad equitable remedial powers regarding marital dissolutions; *Doe* v. *Doe*, 244 Conn. 403, 423, 710 A.2d 1297 (1998); it is also undisputed that the trial court's power to dissolve a marriage and to order custody, care and education of any minor children of the parties, incidental to the dissolution action, is statutorily based. *Morrow* v. *Morrow*, 165 Conn. 665, 668, 345 A.2d 561 (1974); *Dunham* v. *Dunham*, 97 Conn. 440, 443–44, 117 A. 504 (1922); *Steele* v. *Steele*, 35 Conn. 48, 54 (1868). Consequently, the issue of the trial court's jurisdiction is one of statutory construction, over which our review is plenary. *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 53, 607 A.2d 424 (1992); see *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221, 435 A.2d 24 (1980).

An extensive analysis of the pertinent statutes is unnecessary, however, in light of our recent decision

---

[6] See footnote 2 of this opinion for the text of § 46b-84.

in *Doe* v. *Doe*, supra, 244 Conn. 422, wherein we held that although the concept of a "child of the marriage" continues to define who is considered legally to be a parent, it no longer creates jurisdictional limitations.[7] In *Doe*, this court verified a dissolution court's jurisdiction, pursuant to § 46b-56, over the issue of the custody and support of a minor child who did not fit the statutory definition of a "child of the marriage." Id., 439. Specifically, based upon the statutory scheme governing domestic disputes, this court concluded that, although "the concept of 'child of the marriage,' and its corresponding definition of parentage, [once] imposed jurisdictional limitations on the trial court's power to enter custody [and support] orders in dissolution cases," the definition of parenthood no longer imposes a jurisdictional limitation on a dissolution court with regard to custody and support determinations.[8] Id.; see generally *Kennedy* v. *Kennedy*, 177 Conn. 47, 50, 411 A.2d 25 (1979) (jurisdiction to make and enforce orders for care, custody, and education of minor children is derived from court's statutory jurisdiction over dissolution of marriage). Therefore, we conclude that, regardless of whether the child at issue in the present case is considered a "child of the marriage," the trial court had subject matter jurisdiction to order pendente lite child support.

[7] This court held that, although § 46b-56 no longer includes the phrase "child of the marriage," the concept "remains implicit in our entire statutory scheme governing marital dissolutions and retains viability by continuing to define who is a parent . . . ." *Doe* v. *Doe*, supra, 244 Conn. 422. The court continued: "[T]he meaning of [the concept of a 'child of the marriage'], in the context of a martial dissolution case, is limited to a child conceived by both parties, a child adopted by both parties, a child born to the wife and adopted by the husband, a child conceived by the husband and adopted by the wife, and a child born to the wife and conceived through artificial insemination by a donor pursuant to [General Statutes] §§ 45a-771 through 45a-779." Id., 435.

[8] In so concluding, we departed from our earlier holdings that were based upon a prior statutory scheme that denied the court jurisdiction to award custody and/or support of children who were not children of the marriage. See, e.g., *Remkiewicz* v. *Remkiewicz*, 180 Conn. 114, 116–17, 429 A.2d 833

## II

The second issue on appeal is whether the trial court acted improperly when it equitably estopped the defendant from denying that he is the father of the plaintiff's older child. We conclude that the trial court's action was proper.

Before turning to the merits of the parties' arguments, we first set forth principles that will assist us in resolving this issue. To begin, it is well settled that "judicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the court correctly applied the law and could reasonably have concluded as it did. E.g., *Smith* v. *Smith*, 185 Conn. 491, 494, 441 A.2d 140 (1981); *Basile* v. *Basile*, 185 Conn. 141, 144, 440 A.2d 876 (1981); *McGuinness* v. *McGuinness*, 185 Conn. 7, 13, 440 A.2d 804 (1981). 'It is the sole province of the trial court to weigh and interpret the evidence before it and to pass upon the credibility of witnesses.' *Smith* v. *Smith*, supra, 493." *Beede* v. *Beede*, 186 Conn. 191, 194–95, 440 A.2d 283 (1982).

The party claiming estoppel—in this case, the plaintiff—has the burden of proof. *Middlesex Mutual Assurance Co.* v. *Walsh*, 218 Conn. 681, 699, 590 A.2d 957 (1991). Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous. *Dornfried* v. *October Twenty-Four, Inc.*, 230 Conn. 622, 636, 646 A.2d 772 (1994); *Middlesex Mutual Assurance Co.* v. *Walsh*, supra, 699. A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there *is* evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. *Dornfried* v. *October Twenty-Four,*

(1980); *Morrow* v. *Morrow*, supra, 165 Conn. 668; *LaBella* v. *LaBella*, 134 Conn. 312, 316, 57 A.2d 627 (1948).

*Inc.*, supra, 636; see also *Barbara Weisman, Trustee* v. *Kaspar*, 233 Conn. 531, 541, 661 A.2d 530 (1995). The legal conclusions of the trial court will stand, however, only if they are legally and logically correct and are consistent with the facts of the case. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, supra, 181 Conn. 221–22. Accordingly, we will reverse the trial court's legal conclusions regarding estoppel only if they involve an erroneous application of the law. See *Deer Hill Arms II Ltd. Partnership* v. *Planning Commission*, 239 Conn. 617, 628, 686 A.2d 974 (1996).

Strong public policies have long formed the basis of the doctrine of equitable estoppel.[9] "The office of an equitable estoppel is to show what equity and good conscience require, under the particular circumstances of the case, irrespective of what might otherwise be the legal rights of the parties." (Internal quotation marks omitted.) *State ex rel. DeGregorio* v. *Woodruff*, 135 Conn. 31, 36, 60 A.2d 653 (1948). "No one is ever estopped from asserting what would otherwise be his right, unless to allow its assertion would enable him to do a wrong." *Hartford* v. *Mechanics Savings Bank*, 79 Conn. 38, 41, 63 A. 658 (1906).

"There are two essential elements to an estoppel: the party must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do something to his injury which he otherwise would not have done. Estoppel rests on the misleading conduct of one party to the prejudice of the other. In the absence of prejudice, estoppel does not

---

[9] The doctrine of equitable estoppel should not be confused with the "equitable parent" doctrine, rejected by this court, in which a court "allow[s] a nonparent to seek custody under the same criteria as would be applied to a biological or adoptive parent." *Doe* v. *Doe*, supra, 244 Conn. 479 (*Katz, J.*, concurring and dissenting).

exist. *Breen* v. *Aetna Casualty & Surety Co.*, 153 Conn. 633, 643, 220 A.2d 254 [1966]; *Themper* v. *Themper*, 132 Conn. 547, 550, 45 A.2d 826 [1946]. *Morrow* v. *Morrow*, supra, [165 Conn.] 669." (Internal quotation marks omitted.) *Remkiewicz* v. *Remkiewicz*, 180 Conn. 114, 119, 429 A.2d 833 (1980); see also *Doe* v. *Doe*, supra, 244 Conn. 445 ("estoppel requires proof of two facts: [1] misleading conduct by one party; and [2] detrimental reliance thereon by the other party").

### A

Although this court has considered the doctrine of equitable estoppel in dissolution proceedings, the record in those cases did not support a finding of estoppel. See, e.g., *Doe* v. *Doe*, supra, 244 Conn. 445 ("[d]espite the plaintiff's claim in her brief that she did not pursue an adoption of the child because of the defendant's assurance to her that she was the child's mother, there is no such evidence in this record from which such an inference could be drawn"); *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 119–20 ("[i]t appears from the evidence that neither the state nor [the child's] mother changed position to the injury of either one in reliance on the affidavit of parentage"). Consequently, this court has not had the opportunity to explore fully the parameters of the doctrine in the context of a denial of parenthood and appurtenant child support obligations.

To provide the framework necessary for the resolution of the issue, therefore, we now analyze the doctrine and more fully set forth guidelines as to when a court may properly equitably estop a party in cases such as the present one. To begin, it is important to remember that when all of the elements of estoppel are met, its application prevents an injustice. *Hartford* v. *Mechanics Savings Bank*, supra, 79 Conn. 41. In the context of parental responsibilities, the duty to support the child

is placed fairly on the nonparental party, not solely because of his voluntary assumption of a parental role, but, also because of the misleading course of conduct that induced the child, and the biological parent as the child's guardian, to rely detrimentally on the nonparental party's emotional and financial support of the child. See *Morrow* v. *Morrow*, supra, 165 Conn. 669; contra *Knill* v. *Knill*, 306 Md. 527, 554, 510 A.2d 546 (1986) (Murphy, C. J., dissenting) (applying estoppel because stepparent's "voluntary assumption of the parental role over such an extended period now precludes him [or her] from disavowing parental responsibility for child support"). Essentially, such a rule is designed, in part, to discourage misrepresentations by the nonbiological parent.

It should also be remembered that the party against whom the doctrine is invoked has typically benefited from his status as a parent. *Clevenger* v. *Clevenger*, 189 Cal. App. 2d 658, 671, 11 Cal. Rptr. 707 (1961). Generally, that party has been given the gift of love and affection by a child who considers and treats him as a parent, and has enjoyed the community's recognition of him as a parent, which often entails prestige and fulfillment.

Estopping parties from denying parentage under appropriate circumstances promotes our "oft-expressed policy of supporting the integrity of the family unit and protecting the best interests of the child . . . [and the] child's right to family identification . . . ." (Citations omitted.) *Doe* v. *Doe*, supra, 244 Conn. 469 (*Katz, J.*, concurring and dissenting). Similarly, the doctrine furthers our public policy of favoring the establishment of legal parenthood with all of its accompanying responsibilities. Id., 484 (*Katz, J.*, concurring and dissenting).

Before we fully delineate the contours of the doctrine of equitable estoppel in Connecticut, we find it instructive to examine how the courts in other jurisdictions

have treated this issue. Although courts in many juris-dictions have stated theoretically that a trial court may equitably estop a party to a dissolution proceeding from denying parenthood and appurtenant child support obligations, traditionally, they are strict when it comes to enforcing the requirements of the doctrine.[10] Nevertheless, under the appropriate circumstances, several courts have upheld the doctrine's application to impose a continuing obligation of child support.[11]

Almost four decades ago, in the seminal case of *Clevenger* v. *Clevenger*, supra, 189 Cal. App. 2d 671, the California Court of Appeals created a rule allowing the doctrine to be successfully invoked when the facts showed "that the husband represented to the boy that he was his [natural] father, that the husband intended that his representation be accepted and acted upon by

---

[10] See, e.g., *Clevenger* v. *Clevenger*, supra, 189 Cal. App. 2d 670–71 (no estoppel applied because no misrepresentation to child); *K.A.T.* v. *C.A.B.*, 645 A.2d 570, 573–74 (D.C. App. 1994) (no estoppel applied absent financial detriment); *Knill* v. *Knill*, supra, 306 Md. 537–38 (in four to three decision, no estoppel applied absent financial detriment); *A.R.* v. *C.R.*, 411 Mass. 570, 573–74, 583 N.E.2d 840 (1992) (no estoppel applied where no evidence of detrimental reliance of any kind); *Berrisford* v. *Berrisford*, 322 N.W.2d 742, 745 (Minn. 1982) (no estoppel applied where child too young to have detrimentally relied on defendant's representations and defendant acted as child's father for only fourteen months); *Miller* v. *Miller*, 97 N.J. 154, 170, 478 A.2d 351 (1984) (remand for further finding of facts regarding future detriment where natural parents married during conception and birth of children, children knew of true paternity, and stepfather actively had discouraged natural father from supporting children); *Wiese* v. *Wiese*, 699 P.2d 700, 702 (Utah 1985) (no estoppel applied where child conceived by prior husband during that marriage).

[11] See, e.g., *In re Marriage of Johnson*, 88 Cal. App. 3d 848, 852, 152 Cal. Rptr. 121 (1979) (applying estoppel doctrine where husband acted as father for six years); *Watts* v. *Watts*, 115 N.H. 186, 189, 337 A.2d 350 (1975) (estopping defendant where he acknowledged children as his own for fifteen years); *M.H.B.* v. *H.T.B.*, 100 N.J. 567, 498 A.2d 775 (1985) (affirming appellate court judgment estopping defendant from disclaiming paternity in per curiam decision); *Pietros* v. *Pietros*, 638 A.2d 545, 547 (R.I. 1994) (employing equitable estoppel where natural mother's decision to bear child was direct result of husband's assurances that he would serve as child's father).

the child, that the child relied [detrimentally] upon the representation and treated the husband as his father and gave his love and affection to him, [and] that the child was ignorant of the true facts . . . ."

According to *Clevenger*, the child's detrimental reliance in such a situation could take many forms: "(1) It would deprive the child of the potential action of the mother, as his guardian, at the time of the child's birth, to hold the natural father liable for the support of the child. The child thus relies upon the husband's representation and does not attempt to find the natural father. . . . This reliance works a definite detriment to the child.[12] (2) It would induce the child to accept the husband as his natural father and render to him the affection and love of a son, with the son's reasonable expectation of care, support and education until adulthood. The reversal of this representation, through the publication of the illegitimacy of the child, inflicts deep injury upon him. To be designated as an illegitimate child in preadolescence is an emotional trauma of lasting consequence. Having placed the cloak of legitimacy upon the child, having induced the child to rely upon its protection, the husband by abruptly removing it surely harms the child. The child has therefore relied on the conduct of the husband to his injury. (3) It would induce the child to hold himself out to the community as the natural son of the husband . . . only to suffer the abrupt removal of that status, and to undergo the subsequent social injury." Id., 671–72. The court in *Clevenger*

---

[12] In two subsequent cases, however, the California Court of Appeals estopped the denial of paternity without inquiring into the viability of an action to determine the identity of the nonparty natural father and for child support. See *In re Marriage of Johnson*, 88 Cal. App. 3d 848, 852, 152 Cal. Rptr. 121 (1979); *In re Marriage of Valle*, 53 Cal. App. 3d 837, 842, 126 Cal. Rptr. 38 (1975). Thus, the doctrine that has developed in California focuses on emotional harm, without any requisite economic detriment. *Knill* v. *Knill*, supra, 306 Md. 545–46 (Murphy, C. J., dissenting). As such, California has established a minority rule for equitable estoppel in the paternity context.

elaborated that the party's representation must be of such a lengthy period that it frustrates any realistic opportunity of discovering the child's natural parent and creating a parent-child relationship. Id., 675.

Since *Clevenger* was decided, courts in various jurisdictions have considered the doctrine, differing as to the circumstances under which a trial court may equitably estop a party from denying the legal obligations of a parent. Most significantly, they diverge as to the type of detrimental reliance that should be required, with the majority rule finding emotional detriment alone insufficient grounds for estoppel.[13] Of the majority of cases imposing financial detriment as a requirement, *Miller* v. *Miller*, 97 N.J. 154, 167, 478 A.2d 351 (1984), perhaps most succinctly describes the three components to equitable estoppel—"representation, reliance and detriment"—cloaking all three in financial garb.

To begin, the New Jersey Supreme Court set forth its standard regarding misrepresentation. The *Miller* court did not require that the natural parent invoking the doctrine establish that the children believe that the stepparent is their natural parent, because it did not want to limit estoppel to cases in which the stepparent came into the family when the children were infants. Id., 167–68. The stepparent, however, must have made

---

[13] See, e.g., *In re Marriage of Johnson*, 88 Cal. App. 3d 848, 852, 152 Cal. Rptr. 121 (1979) (estopping party regardless of monetary detriment); *K.A.T.* v. *C.A.B.*, 645 A.2d 570, 573–74 (D.C. App. 1994) (requiring financial detriment in order to invoke equitable estoppel doctrine); *Knill* v. *Knill*, supra, 306 Md. 538 (same); *A.R.* v. *C.R.*, 411 Mass. 570, 574–75, 583 N.E.2d 840 (1992) (finding no estoppel and declining to decide whether emotional detriment alone sufficient to uphold claim of equitable estoppel); *Watts* v. *Watts*, 115 N.H. 186, 188–89, 337 A.2d 350 (1975) (estopping husband from denying paternity without explicit equitable estoppel analysis); *Miller* v. *Miller*, 97 N.J. 154, 168–69, 478 A.2d 351 (1984) (estoppel only where party's actions precluded child from obtaining future support from nonparty biological parent); *Pietros* v. *Pietros*, 638 A.2d 545, 547 (R.I. 1994) (employing equitable estoppel to serve best needs of child on case-by-case basis); *Wiese* v. *Wiese*, 699 P.2d 700, 702 (Utah 1985) (adopting rule in *Miller*).

some representation of support to either the children or the natural parent. Id., 168.

Most significantly, the *Miller* court required that the natural parent invoking the doctrine establish that, if the stepparent is not estopped, the children will suffer *future* financial detriment as a result of the stepparent's past active interference with the financial support by the child's natural parent. Id., 168–69. It is imperative for the stepparent to have taken positive steps of interference with the natural parent's support obligations in order for the court to bind the stepparent to support the children in the event of a divorce. Id., 170. Future economic detriment is established, for instance, whenever a custodial natural parent proves "that he or she (1) does not know the whereabouts of the natural parent; (2) cannot locate the other natural parent; or (3) cannot secure jurisdiction over the natural parent for valid legal reasons, *and* that the natural parent's unavailability is due to the actions of the stepparent . . . ." (Emphasis added.) Id., 169.[14]

Persuaded by the reasoning in *Miller*, we conclude that the equitable estoppel doctrine properly imposes a burden on the party seeking to invoke the doctrine to demonstrate representations of financial as well as emotional support. The concerns about misrepresentation and detrimental reliance are placed more appropriately on any promises of emotional *and* financial support, not on any misrepresentations and reliance regarding biological parentage. Requiring that children

---

[14] The New Jersey Supreme Court also created a rule to soften the transition for the natural parent and the child. The court permits a natural parent to obtain pendente lite child support from a stepparent until the trial court has made a determination regarding permanent child support. *Miller* v. *Miller*, supra, 97 N.J. 167. A court can order such support if the natural parent demonstrates that the children are not receiving support from the nonparty natural parent and that "the stepparent's conduct actively interfered with the children's support by their [nonparty] natural parent, so that pendente lite support may not be obtained from the natural parent . . . ." Id.

believe that the stepparent is their natural parent unjustly would deny support to some children who, nevertheless, have relied detrimentally on representations of emotional and financial support.[15]

Furthermore, to permit estoppel when there is *only* emotional detriment would create enormous policy difficulties. Id., 168; see *K.A.T.* v. *C.A.B.*, 645 A.2d 570, 572 (D.C. App. 1994). A requirement of emotional detriment alone would discourage parent-child bonding by rewarding stepparents who do not create a familial bond with their stepchildren, while punishing those who do, by requiring them to be responsible for them as a legal parent in the event of a divorce. *K.A.T.* v. *C.A.B.*, supra, 572; *Miller* v. *Miller*, supra, 97 N.J. 168. In contrast to financial harm, the emotional harm outlined by the court in *Clevenger* v. *Clevenger*, supra, 189 Cal. App. 2d 671–72, while very real, cannot necessarily be prevented by equitable estoppel, which is naturally confined to a party's legal obligations.[16] Moreover, a rule requiring only emotional detriment could be very difficult for courts to apply. Hence, while emotional detriment should be a factor, it should not be the sole basis upon which to determine whether to apply the equitable estoppel doctrine.

We recognize that, as with other domestic issues, in deciding whether to apply the doctrine of equitable estoppel, courts must act judiciously and with sensitivity to the facts particular to each case. *M.H.B.* v. *H.T.B*, 100 N.J. 567, 572, 498 A.2d 775 (1985). We are also mindful that equitably estopping parties from denying

---

[15] Additionally, because such a requirement could encourage bad faith disclosures by the stepparent hoping to avoid any child support obligations, the requirement is to be avoided.

[16] For example, although a court can estop a party from legally denying paternity, and, therefore, require him to support a child financially, it cannot prevent a party from telling that child that he is not the child's biological father or from ceasing to emotionally support the child.

parenthood is an extraordinary measure because it involves a judicially created imposition of parental status and attendant responsibility. *K.A.T.* v. *C.A.B.*, supra, 645 A.2d 572. It is with such sensitivity and caution that we now turn to the facts of the present case.

## B

Having set forth the doctrine of equitable estoppel in the context of a party attempting to disclaim parenthood and appurtenant child support responsibilities, we turn to the facts of the present case. It is undisputed that the defendant agreed to pay temporary child support as the father of the plaintiff's two children for the first ten months following the institution of the underlying dissolution, and that it was not until November, 1997, that the defendant moved for paternity testing regarding the older child. Subsequently, the trial court estopped the defendant from denying paternity.

As a part of that determination, the trial court reasonably found that the defendant's actions had induced the child and her mother, the plaintiff, to believe that the defendant would always emotionally and financially support the child as his own and that the child and her mother had relied on such assurances to their present and future detriment. It is undisputed that the defendant acted as if he were the child's father throughout the child's life. Recognizing that the defendant might not be the child's biological father, the parties nevertheless agreed, immediately after her birth, that the minor child would carry the defendant's surname. The court found that, throughout the child's life, the defendant consistently treated her as his daughter and provided her with financial and emotional support. There is little doubt that the child would suffer an enormous emotional trauma if she learned that the defendant is not her father, or that he was no longer responsible for her well-being. The court also concluded that the defendant's

actions helped to prevent the formation of a loving and nurturing relationship with her natural father.

Additionally, the court found abundant evidence of past, present and future financial detriment as a result of the defendant's conduct. His actions frustrated the creation of the child's right to any financial support from her natural father. By destroying the plaintiff's unprocessed paternity papers soon after the child's birth, the defendant impeded the plaintiff's efforts to seek both child support from the biological father and public assistance from the state of Rhode Island. According to the trial court, the defendant purposefully engaged in such acts because he did not want the child's natural father to play any role in the child's life. Consequently, the defendant is the only father who has ever supported or nurtured the child. The trial court found that the whereabouts and wherewithal of D, the man it presumed to be the child's natural father, were unknown at the time of the hearing. We conclude, therefore, on the basis of the facts as found by the trial court, that the court properly estopped the defendant from denying paternity.

### III

The third and final issue the defendant has raised on appeal is whether the trial court improperly denied his November 17, 1997 motion to modify the temporary child support order. For the reasons set forth hereinafter, we decline to reach this issue. Thus, we affirm the trial court's denial of the defendant's motion.

It is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. Practice Book § 60-5; *Yale University* v. *Blumenthal*, 225 Conn. 32, 36 n.4, 621 A.2d 1304 (1993) (issue not reviewed because not raised at trial). This court will review claims not raised at trial only in extraordinary circumstances. See *Williamson*

v. *Commissioner of Transportation*, 209 Conn. 310, 317, 551 A.2d 704 (1988). "[B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court. Practice Book § 4185, [now § 60-5] ('court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial'); *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996) (claims 'neither addressed nor decided' by court below are not properly before appellate tribunal); *State* v. *Miller*, 186 Conn. 654, 658, 443 A.2d 906 (1982) ('[o]nly in the most exceptional circumstances will this court consider even a constitutional claim not properly raised and decided in the trial court')." *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 52, 717 A.2d 77 (1998).

General Statutes § 46b-86 (a) sets forth the relevant law regarding this claim. That section provides in relevant part that "support pendente lite may at any time . . . [be] modified . . . upon a showing of a substantial change in the circumstances of either party or upon a showing that the final order for child support substantially deviates from the child support guidelines established pursuant to section 46b-215a, unless there was a specific finding on the record that the application of the guidelines would be inequitable or inappropriate. . . ."

In the present case, in his motion to modify the support order, the defendant argued that since the last support order on September 29, 1997, the defendant's income had substantially decreased and, therefore, the amount that he previously had been ordered to pay *now* significantly exceeded both his ability to pay and the amounts provided in the child support guidelines. The trial court denied the motion because the defendant had failed to demonstrate, by a preponderance of the evidence, that his financial circumstances had changed

substantially since the time of the September, 1997 order.

On appeal, the defendant does not challenge the trial court's finding that his financial circumstances had not changed subsequent to the September, 1997 order. Rather, he claims that when the trial court denied his November, 1997 motion to modify the September, 1997 order, it "abused its discretion in deviating from the child support guidelines without having made the necessary predicate findings, and in imputing available overtime work to his earning capacity without additional findings." Although § 46b-86 authorizes the trial court to modify the prior order if the moving party proves that the prior order substantially deviated from the guidelines at the time of the prior order, the defendant never alerted the trial court to the issue of whether the September, 1997 order constituted an unjustified deviation from the guidelines. Consequently, the defendant is responsible for a decision that is silent as to whether the other ground authorized by § 46b-86 as a basis for modification had been satisfied. We decline to review the defendant's claim regarding an unjustified deviation at the time of the September, 1997 motion as we deem it to have been waived in the trial court.

IV

In conclusion, we hold that the trial court had jurisdiction to determine the pendente lite child support order pursuant to this dissolution action. We also conclude that the trial court acted properly when it equitably estopped the defendant from denying his paternity. Finally, we decline to reach the defendant's claim regarding the trial court's denial of his motion to modify the trial court's September, 1997 pendente lite child support order.

The judgment is affirmed.

In this opinion the other justices concurred.