******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## SHANNON DOYLE *v.* SHANE
## SHANE CHAPLEN *v.* SHANNON DOYLE
## (AC 38718)

Keller, Bright and Harper, Js.

*Syllabus*

In the first action, the Office of the Attorney General, on behalf of the Commissioner of Social Services, and in the name of the mother, D, filed a petition for support of a minor child against the acknowledged father, C, with the Family Support Magistrate Division of the Superior Court. Following the judgment in the support action, in which C acknowledged paternity of the child, D filed a motion to open the judgment seeking genetic testing to establish paternity, which eventually established that C was not the child's biological father. In a second action, C filed an application for custody of the minor child, and the cases were consolidated. The trial court granted D's motion to open the judgment, rendered judgment of nonpaternity in the first action and judgment in favor of D in the second action. On appeal to this court, C claimed, inter alia, that the trial court improperly found that D signed the acknowledgment of paternity on the basis of a material mistake of fact and concluded that opening the judgment was in the best interests of the minor child after making a clearly erroneous finding that he had no parent-like relationship with the minor child. *Held*:

1. The trial court's finding that D signed the acknowledgment of paternity on the basis of a material mistake of fact was not clearly erroneous; that court credited D's testimony and found that her belief that C was the biological father was reasonable because she had relied on ultrasounds and advice from medical technicians, and had formed that belief on the basis of information that she had no reason to doubt, and the court having found that D established that there had been a material mistake of fact, it had the authority, pursuant to statute (§ 46b-172 [a] [2]), to grant D's motion to open.

2. The trial court's finding that C did not have a parent-like relationship with the minor child was not clearly erroneous and was supported by ample evidence in the record: that court heard testimony that C was not a consistent presence in the child's life prior to his filing the custody action and that he had more of a friendship with the child, rather than a parent-like relationship, and although there was evidence that could have supported a finding that he had a parent-like relationship with the minor child, it was the exclusive province of the trier of fact to weigh any conflicting evidence and to determine the credibility of the witnesses; moreover, in light of that determination, the trial court's conclusion that it was in the best interests of the child to open the judgment also was not clearly erroneous.

3. The trial court properly determined that D was not equitably estopped from opening the judgment in the support action; that court found that C did not meet his burden of proving either element of equitable estoppel, as there was no evidence demonstrating that D had engaged in any misleading conduct in that both D and C mistakenly believed that C was the child's father and they both had a basis for that mistaken belief, and C failed to meet his burden to prove that he suffered prejudice as a result of his reliance on D's alleged misrepresentations, and the court also found that if C were to be removed from the minor child's life, the child would not suffer any adverse emotional effects or potential financial detriment because the child's biological father was available as a source of financial support.

Argued January 18—officially released August 21, 2018

*Procedural History*

Petition, in the first case, for support of a minor child, and for other relief, brought to the Superior Court in the judicial district of Litchfield, Family Support Magistrate

Division, where the family support magistrate, *David A. Dee*, rendered a judgment of support, and application, in the second case, for custody of a minor child, and for other relief, brought to the Superior Court in the judicial district of Litchfield, Family Support Magistrate Division, where the family support magistrate, *Jed N. Schulman*, issued an order consolidating the two cases and that they be heard by the Superior Court; subsequently, the court, *Danaher, J.*, granted the motion of the plaintiff in the first case to open the judgment, and rendered judgment of nonpaternity in the first case and judgment for the defendant in the second case, from which the defendant in the first case and the plaintiff in the second case appealed to this court; thereafter, the court, *Danaher, J.*, granted in part the motion filed by the defendant in the first case and the plaintiff in the second case, for articulation. *Affirmed.*

*John K. Miller*, for the appellant (defendant in the first case, plaintiff in the second case).

*Maureen E. Donahue*, guardian ad litem, for the minor child.

*Opinion*

BRIGHT, J. This appeal arises out of two actions that were consolidated by the trial court. In the first action (support action), the Office of the Attorney General, on behalf of the Commissioner of Social Services (commissioner) and in the name of Shannon Doyle, filed a petition for support (support petition) against Shane Chaplen, the acknowledged father of Doyle's minor child. In the second action (custody action), Chaplen[1] filed an application for custody of the minor child, pursuant to General Statutes §§ 46b-56 and 46b-61. In the support action, Chaplen appeals from the judgment of nonpaternity rendered by the trial court following the granting of Doyle's motion to open the judgment of paternity by acknowledgement;[2] in the custody action, Chaplen appeals from the judgment of the trial court rendered in favor of Doyle.[3]

On appeal,[4] Chaplen claims that the trial court erred in granting Doyle's motion to open the judgment of paternity in the support action for the purpose of declaring him not to be the father of the minor child.[5] Specifically, he claims that the trial court improperly (1) found that Doyle signed the acknowledgment of paternity on the basis of a material mistake of fact, (2) concluded that opening the judgment was in the best interests of the minor child after making a clearly erroneous finding that there was no parent-like relationship between Chaplen and the minor child, and (3) applied the law regarding laches and equitable estoppel. We affirm the judgments of the trial court.

The following facts and procedural history, as found by the trial court or as undisputed in the record, inform our resolution of Chaplen's appeal. On February 5, 2013, the Office of the Attorney General, on behalf of the commissioner and in the name of Doyle, filed a support petition against Chaplen, the acknowledged father of the minor child, pursuant to General Statutes § 17b-745, formerly § 17-324, and General Statutes §§ 46b-215 and 46b-172. A copy of a fully executed acknowledgment of paternity, with the mother's affirmation of paternity, was attached to the support petition, which Chaplen and Doyle both had signed two days after the minor child was born.[6]

"In the [support action], the [commissioner], in the name of . . . Doyle, asserted in [the] . . . support petition that [the minor child], born [in] [October, 2011], was receiving Medicaid child support services. The petition asserted, further, that Chaplen is the acknowledged father of the minor child and that Chaplen had refused or neglected to support the minor child. . . .

"On March 25, 2013, the court [rendered a judgment of support], order[ing] that Doyle and Chaplen were equally responsible for the minor child's health care costs. On August 20, 2014, Doyle filed her appearance

in the [support action] and also filed a motion to open the judgment, asserting that she 'was not present at this case' and was seeking genetic testing to establish paternity. . . . By order dated December 8, 2014, the [f]amily [s]upport [m]agistrate ordered that the motion to open be addressed in the Superior Court.

"On May 29, 2014, Chaplen initiated the custody action, seeking sole legal custody of the minor child, primary residence with him, and child support payments from Doyle. . . . Thereafter, the parties agreed to the appointment of a guardian ad litem and also agreed to supervised visitation between Chaplen and the minor child who, as of the date of that first agreement, was two years of age."

Doyle, with the assistance of her mother, had a genetic test performed in or around September, 2014, which established that Chaplen is not the biological father of the child. The court found: "On October 6, 2014, Doyle moved to modify the order of visitation . . . . Thereafter, the parties filed a series of motions regarding visitation and also reached a series of agreements allowing Chaplen visitation."

On February 5, 2015, the court held a hearing on Doyle's motion to open, and Doyle was the only witness to testify. The parties agreed to bifurcate the proceedings, agreeing that the court first would address whether there had been a material mistake of fact that would permit opening the judgment of paternity by acknowledgment, pursuant to General Statutes § 46b-172,[7] before addressing whether equitable doctrines precluded opening the judgment.

At the hearing, Doyle testified that she began to question whether Chaplen was the biological father when the minor child was approximately six months old. She claimed that when the child was approximately one year old, in October, 2012, the Department of Children and Families (DCF) became involved with her, and she expressed her doubts as to the paternity of the child at that time. Doyle testified that she had been asking for a genetic test "since this all started," but Chaplen refused. She claimed that Chaplen had been aware of the possibility that he was not the child's father since the child was one year old because they had a meeting with DCF and discussed genetic testing at that time.

Doyle further testified that, upon receiving advice from the guardian ad litem, she contacted Raymond Osterhoudt, the man whom she believed to be the child's biological father, and she brought the child and Osterhoudt to have a genetic test performed. The results of the genetic test confirmed that Osterhoudt is the biological father, and the results were admitted into evidence.

The court credited Doyle's testimony that she did not believe that Osterhoudt was the father when the child

was born, finding that the basis for her "belief that Chaplen, and not Osterhoudt, was the father of the minor child was that when Doyle was pregnant with the child, she had an ultrasound test that produced an indicator as to the number of weeks of the fetus' development. The technicians who performed the test explained to Doyle that the testing equipment measured the level of development of the fetus. Other technicians had given Doyle similar information with regard to one of Doyle's earlier pregnancies. Doyle took the information generated by the ultrasound equipment, counted [backward] on a calendar, and thereby concluded that she and Chaplen had had sexual relations at the time the child was conceived. Doyle had used this same method of determining the date of conception, on earlier occasions, with one or more of her other children." The court found that Doyle had established that there had been a material mistake of fact that warranted opening the judgment of paternity in the support action because Doyle "received advice from medical technicians that she accepted and that she had no reason to doubt."

Following its finding that there had been a material mistake of fact, the court held three hearings, on June 25, September 24, and October 7, 2015, in order to address whether equitable principles barred opening the judgment, and whether opening the judgment was in the best interests of the minor child. At the June 25, 2015 hearing, Doyle called several witnesses, including Ashley Brady, Doyle's relative, Brianna Chase and Kaitlyn Vach, Doyle's sisters, and Osterhoudt.

At the hearing, Brady testified that Chaplen was not a consistent presence in the child's life prior to commencing the custody action. Chase testified that Doyle and Chaplen had a hostile relationship, and that excluding Chaplen from the child's life would not be traumatic for the child because Chaplen had not been a consistent presence in the child's life. Chase also testified that, when the child was approximately one year old, she was present at the meeting with DCF when Doyle requested genetic testing. Vach testified that Chaplen did not have a parent-like relationship with the child; she explained that the relationship was more akin to a friendship. Osterhoudt testified that he knew he was the father of the child since the child was approximately one year old, because he and Doyle had purchased a genetic test at Walgreens and the results confirmed that he was the child's father.[8] He expressed his desire to support the child; although he acknowledged that he had not provided Doyle with child support when they initially discovered that he was the child's father; he testified that he wanted to support the child going forward.

Following Doyle's witnesses, "the state introduced evidence that an employee of the Department of Social Services ([department]) [had] sent a notice, dated Janu-

ary 31, 2013, to Doyle advising her that there [would] be a hearing regarding child support . . . on March 25, 2013. The [department] employee then relied on a brief internal notation [in the department's file] . . . to conclude that she had spoken with Doyle by telephone on February 4, 2013, a call placed by Doyle that had been prompted by the January 31, 2013 notice. According to [the department's file], Doyle told the [department] employee that Doyle was receiving $100 per week [for] child support from Chaplen and that she was not seeking a support order. The [department] employee told Doyle that the state needed to obtain a support order and explained that to her. The [department's file] does not indicate whether the [department] employee told Doyle that the March hearing would be going forward, what role Doyle might play in such a hearing, or whether [the department] wanted or needed Doyle to appear at the hearing." (Footnote omitted; internal quotation marks omitted.)

Approximately three months after the June 25, 2015 hearing, on September 24, 2015, Chaplen presented his witnesses. The court heard testimony from the following witnesses: Chaplen, Cynthia Eastman, an employee at Litchfield Visitation Services; James Fournier, a department employee; Jessica LaMesa, Chaplen's former coworker; Patricia Chaplen, Chaplen's mother; JoAnn Maher, Chaplen's girlfriend; and Maureen Donahue, the guardian ad litem and attorney for the minor child. Chaplen testified that he had seen the child every week since the child was born, until May 22, 2014, when Doyle told him that he was not the father and that he would never see the child again. Chaplen submitted several exhibits, including photocopies of money orders, which had been given to Doyle for child support, several photographs of the child, and a personalized calendar that contained photographs of the child for each month in the calendar.

Chaplen also testified that he had claimed the child as a dependent on his 2013 tax return in order to obtain a larger refund. Chaplen explained that Doyle, because she had minimal taxable income in 2013, told him to claim the child as a dependent in order to maximize any tax refund. According to Chaplen, he gave Doyle half of his 2013 tax refund. The court, however, found that there was no evidence to support Chaplen's claim that Doyle told him to claim the child as a dependent.

Chaplen then called Eastman, who had supervised the court-referred visitation between Chaplen and the child. Eastman testified that she "observed a very close and affectionate relationship between" Chaplen and the child. She recalled that, at the first meeting, the child hugged Chaplen and said that he missed Chaplen. Chaplen then called LaMesa, who testified that Doyle would come to the restaurant where Chaplen worked to pick up child support or food. Chaplen's mother

testified that she had known the child since he was born, that she had developed a strong bond with him, and that he calls her "grandma." Additionally, Chaplen called Maher, his girlfriend since September, 2012, who testified that she has a bedroom at her house for the child, and she many times babysits the child for Chaplen. Maher further testified that there is a parental bond between Chaplen and the child.

The last witness to testify was Donahue, whose testimony spanned two hearings, beginning on September 24, 2015, and concluding on October 7, 2015. Donahue testified that although Chaplen and Doyle disagreed as to whether Chaplen had an ongoing relationship with the child, after Chaplen provided her with photographs and videos of Chaplen and the child, she concluded that Chaplen had an ongoing relationship with the minor child until May, 2014. Donahue, however, also acknowledged that she knew "nothing about [Chaplen's relationship with the child] from the time [the child] was born until [the fall of 2014] . . . other than what [she] learned through pictures and conversations with [the] parties." Donahue further testified that it is in the child's best interests to preserve his relationship with Chaplen. Nevertheless, Donahue acknowledged that the child may require therapy in the future as a result of confusion regarding the identity of his father. Donahue also testified that if the court were to grant Doyle's motion to open, then there would be no more controversy between Chaplen and Doyle affecting the child.

Following the hearing on October 7, 2015, the court granted Doyle's motion to open, concluding that laches and equitable estoppel did not preclude the granting of the motion and that opening the judgment was in the best interests of the child. On November 30, 2015, on the basis of its findings in its November 25, 2015 memorandum of decision, the court rendered a judgment of nonpaternity in the support action. Thereafter, on December 3, 2015, Chaplen filed a motion to amend his custody application in order to seek the right of visitation in lieu of custody, which the court denied. The court stated that "even if the request for leave to file the amended petition were not untimely, nonetheless, based on the evidence introduced, I still made the finding . . . that [Chaplen] does not have a parent-like relationship[9] [with the child]." (Footnote added.) Accordingly, the court rendered judgment in favor of Doyle in the custody action. Chaplen filed a motion to reargue on December 15, 2015, which the court denied on December 16, 2015, and Donahue, on behalf of the minor child, filed a motion to reargue, which the court denied on December 17, 2015. This appeal followed.[10]

Chaplen claims that the court erred in granting Doyle's motion to open the judgment of paternity. Specifically, he claims that the court improperly: (1) found that Doyle signed the acknowledgment of paternity on

the basis of a material mistake of fact; (2) concluded that opening the judgment was in the best interests of the child after making a clearly erroneous finding that there was no parent-like relationship between Chaplen and the child; and (3) applied the law regarding laches and equitable estoppel. We address each claim in turn.

We begin by setting forth our standard of review and general legal principles relevant to Chaplen's claims. "Whether proceeding under the common law or a statute, the action of a trial court in granting or refusing an application to open a judgment is, generally, within the judicial discretion of such court, and its action will not be disturbed on appeal unless it clearly appears that the trial court has abused its discretion." (Internal quotation marks omitted.) *Simmons* v. *Weiss*, 176 Conn. App. 94, 98, 168 A.3d 617 (2017). A court's authority to open, correct and modify judgments is restricted by statute and the rules of practice. See *710 Long Ridge Operating Co. II, LLC* v. *Stebbins*, 153 Conn. App. 288, 294, 101 A.3d 292 (2014); see also General Statutes § 52-212; Practice Book § 17-4.

In the present case, the trial court's authority to open the judgment of paternity is limited by § 46b-172 (a) (2), which provides in relevant part: "The mother and the acknowledged father shall have the right to rescind such affirmation or acknowledgment in writing within . . . sixty days . . . . An acknowledgment . . . may be challenged in court . . . after the rescission period only on the basis of fraud, duress or material mistake of fact which may include evidence that he is not the father, with the burden of proof upon the challenger. . . ." Doyle and Chaplen signed the acknowledgment of paternity in October, 2011, and Doyle filed her motion to open on August 20, 2014, which was well beyond the sixty day rescission period. Accordingly, Doyle first needed to establish one of the three statutory grounds for challenging the acknowledgment in order for the court to have the authority to open the judgment of paternity. Consequently, the court was required "to make a factual determination before it [could] exercise its discretion to grant or deny the motion . . . ." (Internal quotation marks omitted.) *Cornfield Associates Ltd. Partnership* v. *Cummings*, 148 Conn. App. 70, 76, 84 A.3d 929 (2014), cert. denied, 315 Conn. 929, 110 A.3d 433 (2015).

Insofar as the court's decision results from its factual findings, those findings will not be disturbed unless they are clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . It is axiomatic that we defer to the trial court's assessment of the credibility of witnesses and the weight to afford their testimony."

(Citation omitted; internal quotation marks omitted.) *New London* v. *Picinich*, 76 Conn. App. 678, 685, 821 A.2d 782, cert. denied, 266 Conn. 901, 832 A.2d 64 (2003). "In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did." (Internal quotation marks omitted.) *Cornfield Associates Ltd. Partnership* v. *Cummings*, supra, 148 Conn. App. 76.

I

Chaplen first claims that the trial court improperly found that he and Doyle signed the acknowledgment of paternity on the basis of a material mistake of fact. We disagree.

Chaplen's claim challenges the court's factual finding that there had been a material mistake of fact, accordingly, our review is limited to whether the court's finding was clearly erroneous.[11] See *Gordon* v. *Gordon*, 148 Conn. App. 59, 65, 84 A.3d 923 (2014) ("[a] trial court's determinations regarding the existence of a mutual mistake or the elements of fraud or duress are findings of fact that we will not disturb on appeal unless they are shown to be clearly erroneous").

In its April 6, 2015 memorandum of decision, the trial court concluded that Doyle had established that a material mistake of fact occurred that warranted opening the judgment of paternity. The court credited Doyle's testimony that on the basis of several ultrasounds, which indicated the development of the fetus in weeks by measuring the size and growth of the fetus, she had calculated the date of conception and determined that she had only had relations with Chaplen during the time of conception. The court reasoned that Doyle had "received advice from medical technicians that she accepted and that she had no reason to doubt." Therefore, the court found that Doyle, believing Chaplen was the father of the child, had signed the acknowledgment of paternity on the basis of a material mistake of fact.

Chaplen argues that the court's findings do not support its conclusion that Doyle signed the acknowledgment of paternity on the basis of a material mistake of fact. Specifically, Chaplen argues that the court credited Doyle's testimony "that she lived with Chaplen prior to the birth of the minor child, but that she had been seeing Osterhoudt around the time of the minor child's conception. She is the mother of five children. She knew, at the time the minor child was born, that it was possible that Osterhoudt was the child's father, but she didn't think Osterhoudt was the father when the child was born [in] [October, 2011]." According to Chaplen, because Doyle knew that it was *possible* that Chaplen

was not the father, she cannot claim that she signed the acknowledgment on the basis of a material mistake of fact.

In support of this claim, Chaplen relies on a Superior Court decision, *Colonghi* v. *Arcarese*, Superior Court, judicial district of Middlesex, Docket No. FA-13-4016846-S (Jan. 10, 2014) (57 Conn. L. Rptr. 444). In *Colonghi*, the defendant, the mother of the minor child, sought to open the judgment of paternity by acknowledgment after the rescission period on the basis of either a material mistake of fact or duress. Id., 444–45. The defendant had been involved with two men during the period of conception and the court found that "[o]nly [the defendant] was in a position to credibly assess the possibility and questions of paternity . . . ." Id., 446. The court reasoned that "[w]ishful thinking is not a material mistake of fact which can later be used to avoid an unpleasant obligation." Id. Relying on contract principles, the court concluded that the defendant bore the risk of the mistake, and that "it would be unconscionable . . . to permit her to take advantage of a situation she herself [had] brought about." Id., 447. Thus, the court denied the defendant's motion to open the judgment of paternity.

In the present case, unlike in *Colonghi*, the court found that Doyle's belief that Chaplen was the father of the child was reasonable because she relied on the ultrasounds and the advice she received from medical technicians. The court did not conclude that Doyle had signed the acknowledgment of paternity on the basis of "wishful thinking," but rather that Doyle, relying on information that she had "no reason to doubt," believed Chaplen was the father of the minor child. Thus, Chaplen's reliance on *Colonghi* is misplaced.[12]

We conclude that Doyle's testimony, which the trial court credited, supports the court's finding that she signed the acknowledgment on the basis of a material mistake of fact. Accordingly, the trial court's finding was not clearly erroneous. Because the court found that Doyle established that there had been a material mistake of fact, the court, pursuant to § 46b-172 (a) (2), had the authority to grant Doyle's motion to open.

## II

Chaplen next claims that the court, after making a clearly erroneous finding that there was no parent-like relationship between Chaplen and the child, incorrectly concluded that opening the judgment was in the best interests of the child. We are not persuaded.

As previously stated in this opinion, "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quo-

tation marks omitted.) *New London* v. *Picinich*, supra, 76 Conn. App. 685.

In its November 25, 2015 memorandum of decision, the court stated: "Important as it is to assess the application of the doctrines of laches and equitable estoppel, the most important analysis is the determination of the best interests of the child." The court listed the following five factors regarding the best interests of the child: genetic information, the past relationship between the acknowledged father and the child, the child's interest in knowing his parental biology, whether the biological father is available as a source of emotional and financial support for the child, and any harm that the child may suffer if the judgment of paternity is opened, including the loss of a parent-child relationship and/or any financial detriment.[13]

The court found "that Chaplen does not have a parental relationship with [the child] and has never had such a relationship during the time that [the child] has been at an age when he is capable of being fully aware of who is caring for him." The court reasoned that Chaplen had moved out of Doyle's residence approximately six months after the child was born, and found that Chaplen "is a person who, from the time [the child] was approximately six months of age, has only occasionally been in [the child's] life. He is more of a friend or infrequent caretaker than a father. . . . [The guardian ad litem] agreed that if the judgment in the support [action] is opened, the controversy among Doyle, Chaplen, and [the child] will finally end. She agreed that [the child], an affectionate child, could establish with anyone the same type of relationship that he has with Chaplen."[14]

Chaplen claims that "[t]he weight of the evidence presented must result in a finding that the [t]rial [c]ourt's finding was clearly erroneous and requires reversal. The totality of the testimony should have resulted in the [c]ourt's finding that . . . Doyle and much of the testimony she elicited from her witnesses was not credible." Chaplen argues that "[t]he [guardian ad litem's] findings and the testimony of . . . Eastman of Litchfield Visitation Services were clear that a significant relationship existed between the minor child and . . . Chaplen prior to the reestablishment of visits through . . . [c]ourt order. . . . Doyle and each of her witnesses painted a picture completely at odds with what the professionals concluded from their investigation." He further argues that opening the judgment of paternity "is clearly not in the best interest[s] of the minor child . . . ."

Similarly, Donahue, on behalf of the minor child, argues that the court "gave no credit to the testimony of the . . . court appointed [g]uardian ad [l]item . . . . The [c]ourt did not acknowledge the testimony that the child had a significant relationship with Chaplen prior to the court's involvement—with the

blessing of the mother. . . . And that that relationship continued unaltered by absences caused by Doyle . . . wherein the witness as well as others testified that the child was clearly attached to Chaplen." (Citations omitted.)

On the basis of the record before us, we conclude that the trial court's finding that Chaplen does not have a parent-like relationship with the minor child is not clearly erroneous because there is ample evidence to support it. Brady, Doyle's relative, testified that Chaplen was not a consistent presence in the minor child's life prior to his filing the custody action. Doyle's sister, Vach, testified that Chaplen did not have a parent-like relationship with the minor child, that their relationship is more like "a friend type deal." To be sure, there is evidence that could have supported a finding that Chaplen did have a parent-like relationship with the minor child, including Donahue's testimony. Nevertheless, "it is the exclusive province of the trier of fact to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony." (Emphasis omitted; internal quotation marks omitted.) *Palkimas* v. *Fernandez*, 159 Conn. App. 129, 133, 122 A.3d 704 (2015); see also *Cavanaugh* v. *Richichi*, 100 Conn. App. 466, 469, 918 A.2d 290 (2007) ("In effect, we are being asked to substitute our judgment, as to the credibility of the witnesses, for the judgment of the trial court. It is axiomatic that we cannot do that."). Accordingly, the court's finding that Chaplen does not have a parent-like relationship with the minor child is not clearly erroneous.[15] Consequently, its conclusion that it was in the best interests of the child to open the judgment of paternity also was not clearly erroneous.

### III

Chaplen finally claims that the court misapplied the law of laches and equitable estoppel, and improperly concluded that Doyle was not barred from opening the judgment of paternity. We disagree.

In support of his laches and equitable estoppel claims, Chaplen alleges the same resultant prejudice, an essential element of each claim. He claims that the court improperly concluded that he failed to establish that he was prejudiced by providing care and support, both emotional and financial, neither of which he would have provided if he had known that he was not the father of the child. The difference between the two claims is only the cause of that prejudice.

As to laches, Chaplen claims that the cause of his prejudice was Doyle's delay in challenging the acknowledgment of paternity. As to equitable estoppel, he claims that the cause of his prejudice was Doyle's misrepresentation that he was the child's father. Because we conclude that the court's finding that Chaplen did

not meet his burden of proving either element of equitable estoppel is not clearly erroneous, our resolution of his equitable estoppel claim necessarily disposes of his claim that Doyle was guilty of laches.[16] See, e.g., *Kalinowski* v. *Kropelnicki*, 92 Conn. App. 344, 352, 885 A.2d 194 (2005) ("Even if we assume that the plaintiff delayed in filing his claim . . . and that the delay was inexcusable, the court found that there was no prejudice to the defendant sufficient to apply the doctrine of laches. . . . We therefore conclude that the evidence is sufficient to support the court's conclusion that the defendant failed to prove laches."); *Sablosky* v. *Sablosky*, 72 Conn. App. 408, 414, 805 A.2d 745 (2002) ("[a]bsent a showing of prejudice, we conclude that the evidence is sufficient to support the court's conclusion that the defendant failed to prove laches").

We first set forth the legal principles and our standard of review applicable to claims of equitable estoppel. "The party claiming estoppel—here, [Chaplen]—has the burden of proof. . . . Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous. . . . The legal conclusions of the trial court will stand, however, only if they are legally and logically correct and are consistent with the facts of the case. . . . Accordingly, we will reverse the trial court's legal conclusions regarding estoppel only if they involve an erroneous application of the law. . . .

"There are two essential elements to an estoppel: the party [against whom it is asserted] must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do something to his injury which he otherwise would not have done. . . . In the absence of prejudice, estoppel does not exist." (Citation omitted; internal quotation marks omitted.) *Fischer* v. *Zollino*, 303 Conn. 661, 667–69, 35 A.3d 270 (2012).

In *Ragin* v. *Lee*, 78 Conn. App. 848, 863, 829 A.2d 93 (2003), this court held "that a child who is the subject of a paternity action has a fundamental interest in an accurate determination of paternity that is independent of the state's interest in establishing paternity for the benefit of obtaining payment for the child's care and any interest that the parents may have in the child." Consistent with that holding, our Supreme Court has recognized that "[e]stoppel cases involving parentage are anomalous in that the reliance interest at issue is not merely that of the party advocating that estoppel be imposed, typically a parent, but also that of a nonparty, namely, the child." *Fischer* v. *Zollino*, supra, 303 Conn. 669 n.6.

In the context of paternity disputes, "the party seeking to invoke estoppel must show that, if [the opposing

party] is permitted to contest . . . paternity, the *child will suffer future financial detriment* as a result of the [opposing party's] past active interference with the financial support by the child's natural parent. . . . It is imperative for the [opposing party] to have taken positive steps of interference with the natural parent's support obligations . . . . Future economic detriment is established, for instance, whenever a custodial natural parent . . . (1) does not know the whereabouts of the natural parent; (2) cannot locate the other natural parent; or (3) cannot secure jurisdiction over the natural parent for valid legal reasons, and . . . the natural parent's unavailability is due to the actions of the [opposing party] . . . ." (Citation omitted; emphasis altered; internal quotation marks omitted.) Id., 671. Consequently, in order to establish prejudice or detrimental reliance in a case involving a denial of paternity, there must be a finding of financial harm to the child.[17] See id., 676 (reversing judgment of trial court "because there was insufficient evidence of financial harm, which is required to establish the element of detrimental reliance in a case involving a denial of paternity").

Chaplen argues that the court should have concluded that Doyle was equitably estopped from opening the judgment of paternity because she misrepresented to Chaplen that he was the child's father, long after she knew that was not the case, and Chaplen relied on Doyle's misrepresentations to his detriment. Essentially, Chaplen argues that he suffered financial and emotional detriment, and, by allowing Doyle to open the judgment of paternity, he will continue to suffer emotional detriment.

In its memorandum of decision, the court found that Chaplen had failed to establish either element of equitable estoppel. First, the court found that there was no evidence demonstrating that Doyle had engaged in any misleading conduct because "[b]oth Doyle and Chaplen mistakenly believed that [Chaplen] was [the minor child's] father, and they both had a basis for that mistaken belief." Doyle, whose testimony the court credited, testified that she did not begin to question that belief until the child was approximately six months old. Moreover, she claimed that Chaplen had been aware of the possibility that he was not the father of the minor child since the child was approximately one year old. Doyle also testified that Chaplen was present at the meeting with DCF when Doyle expressed her doubts about the child's paternity, which occurred when the child was approximately one year old. Thus, the court's finding that Doyle did not mislead Chaplen is supported by evidence in the record that Doyle told Chaplen that he may not be the father of the minor child within months of when she first had doubts as to the child's paternity, and before the state filed the support action against Chaplen.

Second, the court concluded that "[t]o the extent that Chaplen has been prejudiced . . . that prejudice is limited to minimal payments of child support . . . ." The court further concluded that those payments were offset by the income tax refund that Chaplen received for 2013 when he claimed the child as a dependent.[18] Accordingly, the court found that Chaplen had failed to meet his burden to prove that he suffered prejudice as a result of his reliance on Doyle's alleged misrepresentations.

The court also considered whether the child would suffer emotional and financial detriment as a result of opening the judgment of paternity. The court found that if Chaplen were to be removed from the minor child's life, the child would not suffer "significant—if any— adverse emotional effects . . . as he matures." As to potential financial detriment to the child, the court reasoned that Osterhoudt, the child's biological father, was "available as a source of financial support for the minor child." Specifically, the court found that Osterhoudt "wants to meet his obligations as [the minor child's] father" and that he "has the potential to be a presence in [the minor child's] life and to provide the child with financial and emotional support." The court further found "that the current situation is profoundly confusing to the child and, if not corrected, will lead to further confusion going forward." Those factual findings are supported by the record, and therefore they are not clearly erroneous.

On the basis of our review of the record, we conclude that the court's factual findings and legal conclusions are sufficiently supported by the record. We therefore conclude that the court properly determined that Doyle was not equitably estopped from opening the judgment of paternity after finding that Chaplen failed to meet his burden of establishing each element of equitable estoppel.[19]

In sum, we conclude that the court had the authority to open the judgment of paternity under § 46b-172 (a) (2) because the court found that Doyle signed the acknowledgment on the basis of a material mistake of fact.[20] We also conclude that court's findings are not clearly erroneous, and that the court's legal conclusions regarding equitable estoppel and laches are consistent with those findings and are legally and logically correct. Therefore, we conclude that the court did not abuse its discretion in granting Doyle's motion to open.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] For purposes of clarity, we refer in this opinion to all individuals by name rather than by party designation.

[2] General Statutes § 46b-172 (a) (1) provides in relevant part: "[A] written acknowledgment of paternity executed and sworn to by the putative father of the child . . . shall have the same force and effect as a judgment of the Superior Court. . . ." Accordingly, although Chaplen's paternity was not

adjudicated, we refer to the acknowledgment of paternity as a judgment of paternity.

[3] Although Chaplen listed both the support action and the custody action on his appeal form, he makes no specific reference to the judgment in the custody case in his brief. We also note that the relief sought by Chaplen on appeal requests only "that [Doyle's] motion to open . . . be denied or alternatively that this case be remanded for a trial de novo."

[4] Doyle did not participate in this appeal. The state of Connecticut filed a notice stating its intention not to file a brief in this appeal. The attorney for the minor child, who is also the guardian ad litem, filed a brief, pursuant to Practice Book § 67-13, in support of Chaplen's claims on appeal.

[5] The judgments in both the support action and the custody action are based on the court's findings and conclusions, which are set forth in its memorandum of decision granting Doyle's motion to open. The judgment file for the support action provides that the trial court "issued a [m]emorandum of [d]ecision addressing both cases. The [m]emorandum of [d]ecision reopened the support petition and included the reasoning that gave rise to the [j]udgment of nonpaternity of November 30, 2015." The judgment file for the custody action provides that "[t]he reasoning presented in the [m]emorandum of [d]ecision gave rise to the [c]ourt's dismissal of this custody [action] on December 3, 2015." Although the judgment file provides that Chaplen's custody action was dismissed, the court, in its oral decision on December 3, 2015, stated that "the [custody action] is denied, judgment enters in favor of [Doyle] in the custody [action]." The court file also reflects that the disposition is a judgment after a completed trial in favor of Doyle.

[6] The acknowledgment of paternity form is one page and includes both Chaplen's acknowledgment and Doyle's affirmation.

[7] General Statutes § 46b-172 provides in relevant part: "(a) (1) . . . [A] written acknowledgment of paternity executed and sworn to by the putative father of the child when accompanied by (A) an attested waiver of the right to a blood test, the right to a trial and the right to an attorney, (B) a written affirmation of paternity executed and sworn to by the mother of the child . . . shall have the same force and effect as a judgment of the Superior Court. It shall be considered a legal finding of paternity without requiring or permitting judicial ratification, and shall be binding on the person executing the same . . . .

"(2) The mother and the acknowledged father shall have the right to rescind such affirmation or acknowledgment in writing within . . . sixty days . . . . An acknowledgment executed in accordance with subdivision (1) of this subsection may be challenged in court . . . after the rescission period only on the basis of fraud, duress or material mistake of fact which may include evidence that he is not the father, with the burden of proof upon the challenger. . . ."

[8] Osterhoudt's testimony was unclear as to precisely when he received the results of the genetic test he purchased from Walgreens. He initially testified that they took the test in 2012, but then he testified that, around Easter, in February or March, 2013, he learned that he was the child's father. The court did not make a finding as to when Osterhoudt and Doyle received the results confirming that Osterhoudt is the biological father of the minor child.

[9] "In *Roth* v. *Weston*, 259 Conn. 202, 789 A.2d 431 (2002), our Supreme Court held that . . . when a nonparent seeks visitation, that party must allege and prove, by clear and convincing evidence, a relationship with the child that is similar in nature to a parent-child relationship, and that denial of the visitation would cause real and significant harm to the child." *Fennelly* v. *Norton*, 103 Conn. App. 125, 126, 931 A.2d 269, cert. denied, 284 Conn. 918, 931 A.2d 936 (2007).

[10] Chaplen does not challenge the court's denial of his request to amend his custody application.

[11] Chaplen claims that "[i]t is appropriate to employ a de novo or plenary review . . . of the [court's] conclusions relative to the operation of . . . [§] 46b-172." We disagree. Chaplen does not challenge the court's conclusions as to the operation or applicability of § 46b-172, but rather he challenges the trial court's *finding* that there was a material mistake of fact at the time that Chaplen and Doyle signed the acknowledgment of paternity.

[12] Donahue, as the guardian ad litem and attorney for the minor child, agrees with Chaplen and further argues that the court should not have credited Doyle's testimony because Doyle's "honesty and good faith frequently have come into question," and Doyle failed to provide any medical evidence or testimony that would corroborate her claims regarding the

ultrasounds. In effect, Donahue requests that we evaluate Doyle's credibility and retry the facts. That simply is not the role of this court. "We repeat what has become a tired refrain: [W]e do not retry the facts or evaluate the credibility of witnesses." (Internal quotation marks omitted.) *Krystyna W.* v. *Janusz W.*, 127 Conn. App. 586, 591, 14 A.3d 483 (2011).

[13] In *Asia M.* v. *Geoffrey M.*, 182 Conn. App. 22, 35,      A.3d      (2018), the family support magistrate found that the acknowledged father had not established fraud, duress, or material mistake of fact. The magistrate, however, granted the motion to open on the ground that it was in the best interests of the child to do so. Id., 26. The trial court affirmed in part the magistrate's decision. Id., 26–27. On appeal, this court reversed the judgment of the trial court, holding that the magistrate did not have the authority to open the judgment of paternity under § 46b-172 (a) (2) because "the best interests of the child" is not one of the three exclusive statutory grounds for challenging an acknowledgment of paternity. Id., 34–35. This court concluded that "[a]bsent a finding of fraud, duress, or material mistake of fact, an acknowledgment of paternity may not be challenged in court." Id., 34.

In the present case, Chaplen has not claimed that the court improperly considered the best interests of the child. Because the issue has not been raised, we confine our analysis to the argument presented; we therefore assume without deciding that the court properly considered the best interests of the child *after* finding that Doyle had established one of the statutory grounds for challenging the acknowledgment of paternity. See part I of this opinion. We also note that the best interest factors identified by the court are subsumed within the court's analysis of equitable estoppel. See part III of this opinion; see also *W.* v. *W.*, 248 Conn. 487, 498, 728 A.2d 1076 (1999) ("Estopping parties from denying parentage under appropriate circumstances promotes our oft-expressed policy of supporting the integrity of the family unit and protecting the best interests of the child . . . [and the] child's right to family identification . . . . Similarly, the doctrine furthers our public policy of favoring the establishment of legal parenthood with all of its accompanying responsibilities." [Citation omitted; internal quotation marks omitted.]).

[14] Although the court acknowledged that it was unclear exactly how often Chaplen saw the child, the court found that Chaplen saw the child only approximately one time each week.

[15] We note that Chaplen has not claimed that the judgment of the trial court in the custody action should be reversed because the court's finding that no significant parent-like relationship existed between Chaplen and the child is clearly erroneous. In fact, in addressing the court's finding regarding a parent-like relationship, Chaplen argues only that "[t]he failure of the [c]ourt to make the proper inferences from the facts and the testimony is clearly erroneous. The evidence dictates that the granting of . . . Doyle's [m]otion to [o]pen is clearly not in the best interest of the minor child and as such her [m]otion should have been and should be denied."

[16] Chaplen, in his posttrial brief filed in the trial court, did not present an independent analysis of laches. Instead, he argued: "The testimony and arguments applicable to the doctrine of equitable estoppel similarly apply to the . . . [principle] of laches . . . ."

[17] In a situation such as the present case, where the child's mother, instead of the father, is denying the acknowledged or presumed father's paternity, we question, without deciding, whether a showing of future financial detriment to the child should be a necessary requirement for the application of equitable estoppel.

Our Supreme Court, in adopting the requirement of future financial detriment, reasoned that "emotional harm . . . cannot necessarily be prevented by equitable estoppel, which is naturally confined to a party's legal obligations." (Citation omitted.) *W.* v. *W.*, supra, 248 Conn. 503. The court further reasoned that requiring only a showing of emotional detriment would "discourage parent-child bonding by rewarding stepparents who do not create a familial bond with their stepchildren, while punishing those who do, by requiring them to be responsible for them as a legal parent in the event of a divorce." Id. These policy concerns are not implicated, however, where the acknowledged father does not seek to relinquish his parental status and the attendant emotional and financial obligations to the child. As our Supreme Court has noted: "Every paternity action revolves around its own unique set of facts and personal relationships, and a trial court must have flexibility to weight the multiplicity of competing interests that may hang in the balance. . . . Such sensitive and personal affairs are no place for an immutable legal standard that is bordered by bright lines. . . . Not all puta-

tive fathers and not all families are similarly situated; thus their . . . interests cannot be protected by a blanket [rule of law] that treats all putative fathers alike." (Citations omitted; internal quotation marks omitted.) *Weidenbacher* v. *Duclos*, 234 Conn. 51, 76, 661 A.2d 988 (1995); see also *W.* v. *W.*, supra, 503–504 ("[I]n deciding whether to apply the doctrine of equitable estoppel, courts must act judiciously and with sensitivity to the facts particular to each case. . . . [E]quitably estopping parties from denying parenthood is an extraordinary measure because it involves a judicially created imposition of parental status and attendant responsibility." [Citation omitted.]).

In any event, this issue was not raised before the trial court or on appeal, and, accordingly, we leave it for another day. Furthermore, in light of the court's findings that Chaplen did not have a parent-like relationship with the child and that the child would not suffer significant emotional harm if the court granted Doyle's motion to open, Chaplen would not have met his burden of proving prejudice even if emotional detriment alone would be sufficient to equitably estop Doyle from challenging the acknowledgment. See part II of this opinion.

[18] Accepting Doyle's testimony as true, Chaplen's filing of the tax return for 2013 would have occurred more than a year after Doyle told him that he might not be the child's father.

[19] As previously noted in this opinion, because we conclude that the court's finding that Chaplen failed to establish prejudice is not clearly erroneous, we further conclude that the court also properly determined that Doyle was not guilty of laches, as Chaplen alleged the same prejudice for both claims.

[20] Judge Keller, in her thoughtful concurring opinion in *Asia M.* v. *Geoffrey M.*, supra, 182 Conn. 38–40, encouraged the legislature to revise § 46b-172 in order to ensure accuracy in the acknowledgment of paternity process. We agree with Judge Keller's observations and reiterate her suggestion to the legislature to consider amending § 46b-172 so that an acknowledgment of paternity must be accompanied by DNA testing results that are consistent with the putative father's representation. Id., 39. Although § 46b-172 provides an inexpensive and expedient process for establishing paternity of a child born out of wedlock, that process, unfortunately, may lead to considerable future turmoil because it certainly does not ensure accuracy.